# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. MICHAEL SCOTT BROGAN

**Appeal from the Criminal Court for Claiborne County**
**No. 11,071     Bobby Capers, Judge**

---

**No. E2001-00712-CCA-R3-CD**
**July 25, 2002**

---

The defendant, Michael Scott Brogan, entered pleas of guilt to second degree murder and attempted second degree murder. The trial court imposed concurrent sentences of 20 years and 8 years, respectively. In this appeal of right, the defendant asserts that his sentence for second degree murder is excessive. Because the trial court misapplied several enhancement factors, the sentence for second degree murder is modified to 18 years. Otherwise, the judgments are affirmed.

**Tenn. R. App. P. 3; Judgments of the Trial Court Affirmed as Modified**

GARY R. WADE, P.J., delivered the opinion of the court, in which DAVID H. WELLES and NORMA MCGEE OGLE, JJ., joined.

Wesley D. Stone (on appeal) and Ben Pressnell (at trial), Tazewell, Tennessee, and Michael Hatmaker, Jacksboro, Tennessee (at trial), for the appellant, Michael Scott Brogan.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; William Paul Phillips, District Attorney General; and Jared Effler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On October 26, 1997, the fourteen-year-old defendant shot and killed his father's fiancee, Janice Daniels, and wounded his father, Michael Brogan. Earlier that evening, the defendant had argued with his mother, who had been divorced from his father years before, and asked permission to spend the night at the home of his maternal grandfather. When the defendant's mother refused, the defendant reacted angrily, packed some clothes into a bag, and ran up a hill behind his residence. Tony Jones, the defendant's stepfather, attempted to calm the defendant and tried to persuade him to return to the house. As he did so, the defendant's mother telephoned Brogan and threatened to "put [the defendant] out on the street" if Brogan did not come for him.

At the sentencing hearing, Brogan testified that when he arrived at the Jones residence, he found the defendant sitting outside and crying. Brogan recalled that Jones was attempting to calm the defendant, who was despondent because his mother had remarked that his birth was "a mistake." Brogan first argued with the defendant and then ordered the defendant to accompany him. Brogan "just kind of shoved a little bit . . . in [the defendant's] back" as they walked down the hill, after which the defendant complained to his mother that Brogan had struck him in the head. The defendant eventually agreed to spend the night at the Brogan residence. While watching television some three hours later, Brogan felt what he believed to be a gunshot to the right side of his head. The bullet exited under his left eye. He believed he was struck with three or four more shots. According to Brogan, the gun, which belonged to Ms. Daniels, was in the "side" of a recliner where the defendant was seated. After being shot, Brogan called 911. At the time of the shooting, Ms. Daniels, who was approximately three months pregnant, was washing clothes.

The autopsy report indicated that Ms. Daniels died as the result of a gunshot wound which entered the back and then traveled through the lung, diaphragm, aorta, and liver. A certificate of death accompanying the autopsy report established that death occurred within minutes.

Nancy Smith, Janice Daniels's mother, testified at the sentencing hearing that her daughter had lived with Brogan for quite some time before the shooting and was excited about her pregnancy and the recent purchase of a home. According to Ms. Smith, the defendant and Ms. Daniels "got along well." Ms. Smith asked that the defendant receive "the maximum sentence the law will allow."

Brogan testified that the defendant had suffered mental and emotional problems throughout his life. He claimed that he had attempted to get help for the defendant and had taken him to Cherokee Mental Health for treatment. Brogan also stated that the defendant did not perform well in school and had abused alcohol and drugs from an early age. He recalled that the defendant's mother, his custodian, had moved several times during the defendant's life. According to Brogan, the defendant's mother often threatened to call the police or "put [the defendant] on the street." Brogan, who knew of no reason for the shooting, recalled that the defendant expressed happiness when he learned that Ms. Daniels was expecting a baby.

Joshua Michael Burchett, a corrections officer at the Claiborne County Jail, testified that the defendant had been a model prisoner while incarcerated at the jail awaiting disposition of the charge. According to Officer Burchett, the defendant had never displayed any violent behavior and had not been reprimanded.

Dr. Helen Smith, a forensic psychologist who evaluated the defendant after the shooting, testified that the defendant has an I.Q. of 79, borderline mental retardation. In addition, she stated that the defendant was experiencing an "extremely high level of paranoia" and was exhibiting schizophrenic traits. It was her opinion that the defendant misinterprets the actions of others as unnecessarily threatening. Dr. Smith noted that the defendant had been prescribed antipsychotic medications, including Haldol, Zyprexa, and Respirdal, both before and after the shootings. He was

not taking his medication on the day of the shootings. It was Dr. Smith's opinion that, generally speaking, children who kill or try to kill their parents are "extremely unlikely" to commit other violent crimes in the future.

Dr. Smith testified that the defendant had a "love and a hate relationship" with his father. She explained that the defendant felt as though he never "g[o]t enough" from his father, but refused to say anything negative about him. While Brogan was in the hospital, the defendant sent flowers with a note which read, "I love you dad, please don't hate me, love Michael." It was Dr. Smith's opinion that the shootings could have been prevented if the defendant had been removed from his home and properly treated. She stated that the shootings were precipitated by a number of factors, including the lack of family support for the defendant, his drug and alcohol abuse, the drug and alcohol abuse by the defendant's mother and father, and the defendant's overall mental condition. It was her opinion that because the defendant witnessed numerous incidents of domestic violence in the homes of both his mother and father, he learned to use violence to deal with his problems at a very early age. She stated that the defendant wanted "to withdraw when he has a problem" and got frustrated when not permitted to do so. Dr. Smith testified that "if [the defendant had] been allowed to go to his grandfather's house that day, this probably wouldn't have happened."

Dr. Smith described the defendant's mental and emotional problems as the consequence of his highly dysfunctional upbringing. She learned that he lived a transient existence, moving with his mother, only 15 when he was born, from place to place, changing schools some ten times before the eighth grade. According to Dr. Smith, the defendant was suspicious of the paternity of Ms. Daniels's child because he had witnessed "a lot of promiscuity in his life."

Tony Jones, who had been married to the defendant's mother, was living with the defendant and his mother on the day of the shootings. According to Jones, the defendant argued with his mother on that day and attempted to run away. After following the defendant up a hill in an effort to calm him down and prevent him from going further, Jones talked with the defendant until his father arrived. According to Jones, Brogan arrived and "grabbed the back of [the defendant's] head and turned around and said something in words that . . . was hideous." Later, as they were leaving, Brogan put "his arm around [the defendant's] throat and his other arm bent up behind his back" to force him into the truck.

Jean Young, the defendant's great aunt, had allowed the defendant and his mother to live with her at one time. She testified that the defendant's mother has a history of drug abuse and often neglected the defendant. According to Ms. Young, the defendant's father was sixteen years old when the defendant's mother became pregnant. The defendant's mother had attempted suicide on at least two occasions, shooting herself six times with a pellet gun on one occasion and, on another, overdosing on pills and alcohol. Ms. Young recalled that the defendant discovered his mother after each of the suicide attempts. She testified that the defendant had asked her to take him away from his parents so that he could escape their drug abuse.

The defendant contends that his sentence for second degree murder is excessive because the trial court misapplied three enhancement factors. When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see State v. Jones, 883 S.W.2d 597, 600 (Tenn. 1994). "If the trial court applies inappropriate factors or otherwise fails to follow the 1989 Sentencing Act, the presumption of correctness falls." State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992). The Sentencing Commission Comments provide that the burden is on the defendant to show the impropriety of the sentence. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Our review requires an analysis of (1) the evidence, if any, received at the trial and sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancing factors; (6) any statements made by the defendant in his own behalf; and (7) the defendant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210; State v. Smith, 735 S.W.2d 859, 863 (Tenn. Crim. App. 1987).

If the trial court's findings of fact are adequately supported by the record, this court may not modify the sentence even if it would have preferred a different result. State v. Fletcher, 805 S.W.2d 785 (Tenn. Crim. App. 1991). The presumption of correctness is, however, "conditioned upon the affirmative showing in the record that the trial court considered sentencing principles and relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The trial court must place on the record the reasons for the sentence. State v. Jones, 883 S.W.2d 597 (Tenn. 1994).

In calculating the sentence for a Class A felony conviction, the presumptive sentence is the midpoint within the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210(c). If there are enhancement factors but no mitigating factors, the trial court shall set the sentence at or above the midpoint. Tenn. Code Ann. § 40-35-210(d). If there are mitigating factors but no enhancement factors, the trial court shall set the sentence at or below the midpoint. Id. A sentence involving both enhancement and mitigating factors requires an assignment of relative weight for the enhancement factors as a means of increasing the sentence. Tenn. Code Ann. § 40-35-210(e). The sentence must then be reduced within the range by any weight assigned to the mitigating factors present. Id.

In arriving at the defendant's sentence, the trial court applied the following enhancement factors:

1) The offense involved more than one (1) victim;
2) The defendant treated a victim with exceptional cruelty during the commission of the offense;
3) The personal injuries inflicted upon the victim were particularly great; and

4) The defendant employed a firearm during the commission of the offense.

See Tenn. Code Ann. § 40-35-114(3), (5), (6), and (9). The trial court also observed that while the defendant had some history of criminal behavior, see Tenn. Code Ann. § 40-35-114(1), no weight would be attached to that factor. The trial court found that the defendant's "tragic life" presented a "great" mitigating factor and determined that the enhancement and mitigating factors "wash[ed] each other out" resulting in the midpoint sentence of 20 years.

The defendant asserts that the multiple victim enhancement factor is not applicable because he received separate convictions for each victim. In State v. McKnight, 900 S.W.2d 36 (Tenn. Crim. App. 1994), this court ruled that the multiple victim factor, see Tenn. Code Ann. § 40-35-114(3), is not applicable when convictions are entered for each victim, as in this case. See also State v. Williamson, 919 S.W.2d 69, 82 (Tenn. Crim. App. 1995) (holding that the multiple victim enhancement factor cannot be applied when the defendant is convicted of separate offenses against each victim). Because the defendant received separate convictions for each victim, the trial court's application of this factor was erroneous.

The defendant next contends that the application of enhancement factor (5), that the defendant treated the victim with exceptional cruelty, is not supported by the record. Application of this factor requires a finding of cruelty over and above that inherently attendant to the crime for which the defendant is convicted. State v. Embry, 915 S.W.2d 451, 456 (Tenn. Crim. App. 1995). In other words, such evidence must "denote[] the infliction of pain or suffering for its own sake or from the gratification derived therefrom, and not merely pain or suffering inflicted as the means of accomplishing the crime charged." State v. Kelly Haynes, No. W1999-01485-CCA-R3-CD (Tenn. Crim. App., at Jackson, Mar. 14, 2000). Enhancement factor (5) has typically been applied in situations where the victim was tortured or abused. See State v. Davis, 825 S.W.2d 109, 113 (Tenn. Crim. App. 1991). This court has upheld the application of this factor based on proof of extensive physical abuse or torture, see State v. Williams, 920 S.W.2d 247, 259 (Tenn. Crim. App. 1995), as well as proof of psychological abuse or torture, see State v. Thomas Lebron Mills and Carl Franklin Mills, (Tenn. Crim. App., at Knoxville, Dec. 19, 1985) (holding that acts of mental cruelty, by themselves, can be as vicious and scarring as acts of physical cruelty).

Here, the trial court applied this factor because the defendant shot Ms. Daniels more than once and because Ms. Daniels was approximately three months pregnant. Intentional, multiple shooting almost always involves cruelty, but the burden is on the state to establish an extended length of torture. In this instance, the state was unable to prove the kind of abuse, as required by law, that would support the application of this factor. See State v. Thomas Edward Murphy, Jr., No. 02C01-9502-CC-00032 (Tenn. Crim. App., at Jackson, June 28, 1996) (holding that enhancement factor (5) did not apply to a second degree murder conviction where the victim was shot twice in the chest and once in the head). Further, while the intentional shooting of a pregnant woman is inherently cruel, that alone would not support application of enhancement factor (5). In our view, there was an inadequate basis for a finding of exceptional cruelty. See State v. John Dennis Rushing, No. 01C01-9501-CR-00020 (Tenn. Crim. App., at Nashville, Feb. 13, 1996).

Finally, the defendant asserts that the trial court erred by applying enhancement factor (6), that the injuries to the victim were particularly great, because great bodily injury is inherent in the crime of second degree murder. In any homicide case, the personal injuries inflicted upon the victim are by definition "particularly great" because the killing of a person necessarily includes the infliction of great bodily injury. For this reason, enhancement factor (6) is inapplicable. See Tenn. Code Ann. § 40-35-114; Williamson, 919 S.W.2d at 82.

The trial court misapplied enhancement factors (3), (5), and (6). Enhancement factor (1), regarding the defendant's history of criminal behavior, was properly applied even though it was given no weight. The record establishes that the defendant had two prior juvenile convictions for vandalism arising from incidents occurring on the same day. Further, the defendant concedes that enhancement factor (9), that the defendant employed a firearm, is applicable.

The record also demonstrates that certain mitigating factors, as recognized by the trial court, are indeed applicable:

> (1) The defendant, because of youth, lacked substantial judgment in committing the offense;
> (2) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the conduct; and
> (3) Any other factor consistent with the purposes of this chapter.

See Tenn. Code Ann. § 40-35-114(6), (11), and (13). Here, the defendant was fourteen years old when he committed the offenses, supporting application of enhancement factor (6). Dr. Smith predicted that he was not a likely candidate to commit other crimes. The defendant was born to immature parents, was shuffled from place to place and parent to parent, and was, at an early age, exposed to drug and alcohol abuse, domestic violence, and promiscuity. Proof established that each of his parents has attempted suicide. On the day of the shooting, the defendant's mother told him he was "a mistake" and threatened to "put him on the street." When the three inapplicable enhancement factors are not considered, it is our view that the mitigating factors outweigh the single remaining enhancement factor.

Accordingly, the sentence for second degree murder is modified from 20 to 18 years. Otherwise, the judgments are affirmed.

_____
GARY R. WADE, PRESIDING JUDGE